# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 6367 | **DATE** | 8/27/2004 |
| **CASE TITLE** | UNITED STATES vs. JOSEPH WITTJE | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ■ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendant's motion to strike [41-1] and [41-2] is granted in part. Defendant's second motion to strike [    ] is denied as moot. The second motion to strike will not be heard on September 2, 2004 as noticed. Plaintiff's motion for summary judgment on Count I [23-1] is granted. Counts II-IV of the complaint are moot. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | AUG 3 0 2004 | |
| | Notified counsel by telephone. | | date docketed | 54 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 8/27/2004 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| CB | courtroom deputy's initials | | PW mailing deputy initials | |

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 03 C 6367 |
| | ) | |
| v. | ) | Suzanne B. Conlon, Judge |
| | ) | |
| JOSEPH WITTJE, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
AUG 3 0 2004

**MEMORANDUM OPINION AND ORDER**

This dispute concerns the citizenship of Joseph Wittje, an ethnic German from Romania who immigrated to the United States in 1950 and obtained citizenship in 1959. From 1943-1945, Wittje was a Nazi Waffen SS guard at the Sachsenhausen concentration camp near Berlin, Germany. The United States contends that Wittje's membership in the Waffen SS and his residence at Sachsenhausen were not revealed to immigration authorities. The government seeks to revoke Wittje's citizenship under Section 340(a) of the Immigration and Nationality Act of 1952, as amended ("INA"), 8 U.S.C. § 1451(a). The complaint asserts four counts, each sufficient to revoke citizenship if proven. Count I alleges Wittje's visa was unlawfully procured under § 13 of the Displaced Persons Act of 1948, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 ("DPA"), which prohibits issuance of a visa to one who has been a member of a movement hostile to the United States. The government alleges that because the Waffen SS was a movement hostile to the United States, Wittje was not lawfully admitted to this country as required by 8 U.S.C. § 1427(a), and he was not lawfully naturalized. The government seeks summary judgment on Count I of the four count complaint.

1

Wittje moves to strike affidavits and exhibits offered by the government in support of its summary judgment motion.

## BACKGROUND

### I. Facts

The following facts are not disputed by record evidence.[1] Wittje was born on July 29, 1920, in Deutsch St. Michael, Romania. Gov. Facts ¶ 5. Wittje is an ethnic German, or "Volksdeutscher." *Id.* at ¶ 6. Wittje served in the Romanian Army from February 1942 until July 1943, and was a member of the Waffen SS ("Armed SS") from July 27, 1943, until April or May 1945. *Id.* at ¶¶ 7-9. The Waffen SS was a Nazi party organization that included combat units and guard units in concentration camps. The Waffen SS was separate and distinct from the German armed forces ("Wehrmacht"), which played no role in the running of concentration camps. *Id.* at ¶¶ 10-11. Wittje held the rank of SS Schutze (private), and was assigned to the 9th Company SS Death's Head Guard Battalion (Totenkopf-Wachbataillon), previously known as the SS Death's Head Battalion (Totenkopf-Sturmbann), at Sachsenhausen concentration camp near Berlin, Germany. *Id.* at ¶ 12.

Sachsenhausen concentration camp was also known as "Oranienburg Concentration Camp" or "Oranienburg." *Id.* at ¶ 12. Prisoners were confined to Sachsenhausen based solely on their political beliefs, race or religion. *Id.* at ¶ 16. Sachsenhausen prisoners included persons of various European national groups, religious denominations and political opinions, including Jews,

---

[1] Both parties fail to comply with Local Rule 56.1. The government's unauthorized response to Wittje's response to the government's statement of undisputed material facts is disregarded. To the extent Wittje's response to the government's statement of undisputed material facts and his statement of additional facts rely upon legal arguments and fail to cite record evidence, they too are disregarded. Local Rule 56.1(b); *see also, Bordellon v. Chicago Sch. Reform Bd.*, 233 F.3d 524, 527-28 (7th Cir. 2000); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

2

Communists, clergymen, Jehovah's Witnesses, homosexuals and "asocial people." *Id.* at ¶ 15. Prisoners were forced to perform labor and were subjected to gruesome medical experiments. Thousands of prisoners died from inadequate food, unsanitary conditions and experiments, or were killed in the camp's crematorium, gas chamber, shooting pit, and gallows. *Id.* at ¶¶ 17-19.

Upon entering the Waffen SS, Wittje was issued a uniform, which bore the markings of the SS Death's Head Battalion, and received training in the use of a rifle. *Id.* at ¶¶ 13-14. Wittje was paid in German currency for his service in the Waffen SS and, beginning in February 1944, his wife received family support payments from the Waffen SS. *Id.* at ¶¶ 20, 22. In February 1944, Wittje was promoted to SS Sturmmann (private first class). *Id.* at ¶ 21. A year later, he was transferred to the 32nd SS Volunteer Infantry Division "30. *Januar*," a combat division of the Waffen SS, where he was wounded on March 2, 1945. *Id.* at ¶¶ 25-26.

On February 2, 1950, Wittje filed an application with the United States Consulate in Salzburg, Austria for a "nonpreference" immigrant visa. *Id.* at ¶ 27; Wittje Resp. Gov. Facts ¶ 27; Gov. Mem. Ex. 2, ¶ 19; Gov. Mem. Ex. 6. On his application, he listed his places of residence from 1942 to 1943 as the "Rumanian Army," from 1943 to 1944 as "St. Michael, Rumania," from 1944 to 1945 as "Haindorf, Germany," and from 1945 through February 1950 as "Wels, Austria." Gov. Facts ¶ 28. Wittje was not a citizen, national or subject of any country at the time of his application; rather the application designates his nationality as "stateless." *Id.* at ¶ 33. Vice Consul Ralph W. McMahon, one of two vice consuls in the Salzburg Consulate assigned to process visa applications of ethnic Germans, issued Wittje a "nonpreference" quota visa as an "ethnic German." *Id.* at ¶¶ 29-30, 34. Chester G. Dunham was the other vice consul in the Salzburg Consulate assigned to process visa applications of ethnic Germans. *Id.* at ¶ 30. When Wittje applied for and received his visa, the

Waffen SS was listed on the Inimical List of organizations considered hostile to the United States and whose members were excluded from immigration to this country. *Id.* at ¶ 31.

On April 11, 1950, Wittje entered the United States at the Port of New York. Wittje Facts ¶ 3. He was issued a certificate of arrival on August 24, 1950. *Id.* at ¶ 6. On or about June 8, 1959, Wittje filed an application to file his petition for naturalization with a supporting factual statement. *Id.* at ¶ 35. The naturalization application required him to list memberships in "organizations, clubs, or societies in the United States or in any other country . . . before the last 10 years." *Id.* at ¶ 36. Wittje identified only a Roman Catholic youth organization. *Id.* On August 18, 1959, this court granted Wittje's petition for naturalization and issued his certificate of naturalization. *Id.* at ¶ 37.

## II. Motion to Strike Evidence

Evidence submitted at the summary judgment stage must be admissible at trial. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). The court must first determine the admissibility of the evidence presented before reaching the merits of the summary judgment motion. *See Haywood v. Evergreen Motor Cars, Inc.*, No. 02 C 6408, 2003 WL 21418248, at *1 (N.D. Ill. June 18, 2003). Wittje did not seek leave of court before filing his motions to strike specific government evidence. Nonetheless, the court will address his August 2, 2004 motion.[2]

---

[2] On August 20, 2004, Wittje filed a second motion to strike, arguing the exhibits submitted with the government's summary judgment reply brief are not permitted by Rule 56. As long as the reply papers respond to matters placed at issue by Wittje's response brief, and do not introduce new bases for summary judgment, Rule 56 does not prohibit exhibits filed on reply. *See Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996); *see also Balderston v. Fairbanks Morse Engine Div. of Coltec Indust.*, 328 F.3d 309, 318 (7th Cir. 2003) (no Rule 56 prohibition against affidavits submitted with reply). The government's reply exhibits respond to arguments Wittje made in his response brief. In any event, the court did not rely on the government's reply exhibits in granting summary judgment. The August 20, 2004 motion to strike is denied as moot.

### A. Affidavit of Johannes Tuchel, Ph.D.

The government offers the affidavit of Johannes Tuchel, Ph.D. as an expert historian regarding the Waffen SS and the Nazi concentration camp system. Gov. Mem. Ex. 23. Wittje argues Tuchel's affidavit lacks personal knowledge and relevance, and challenges Tuchel's status as an expert.

Tuchel attests he is Director of the German Resistance Memorial Center in Berlin, Germany. Gov. Mem. Ex. 23, ¶ 1. In 1981, he received a political science degree from the Free University of Berlin. *Id.* at ¶ 2. In 1989, he received a Ph.D. *summa cum laude* from that university. *Id.* Tuchel's doctoral dissertation, entitled "The Concentration Camp Inspectorate 1934-1938: Background, Structure and Function of an Organization in the National Socialist Power Apparatus," was published as a book in 1994. *Id.* at ¶ 2. Tuchel's professional career has been devoted to studying modern German history, particularly the National Socialist Nazi era from 1933 to 1945. *Id.* at ¶ 3. He has authored several books and more than twenty scholarly articles on the Gestapo and German concentration camp system, including Sachsenhausen. *Id.* at ¶ 4, Exs. 1 & 2. Tuchel has served as an expert in the examination and authentication of historical documents for international federal authorities, including the Canadian Department of Justice, Crimes Against Humanity and War Crimes Section. *Id.* at ¶ 5. He has not testified in a United States court, but has served as an affiant regarding the Nazi concentration camp system in three district court cases. *Id.* at ¶ 6. In 1998 and 1999, Tuchel testified in Canadian federal court as an expert historian and authenticator of historical documents, specifically regarding the Sachsenhausen concentration camp, training and duties of camp guards, the origin and evolution of the Waffen SS and the recruitment of ethnic Germans by the Waffen SS. *Id.* at ¶ 7.

Tuchel explains the SS was originally created in 1925 as a Nazi party organization and personal bodyguard for Adolf Hitler. *Id.* at ¶ 10. By 1934, the SS evolved to serve as an instrument of terror towards political opponents and obtained complete control over the concentration camps in Germany. *Id.* at ¶¶ 10-11. In 1936, the SS concentration camp guard units were officially designated "SS Death's Head Units." *Id.* at ¶ 31. The SS Death's Head Units were not part of the armed forces or the police. *Id.* Their mission, "in addition to training armed political soldiers, [was] to guard the enemies of the state held in the concentration camps." *Id.* at ¶ 32.

Tuchel explains that Sachsenahusen concentration camp was also known as "Oranienburg Concentration Camp" or "Oranienburg." *Id.* at ¶ 36. Prisoners were confined to Sachsenhausen based solely on their political beliefs, race or religion. *Id.* at ¶ 51. Prisoners were forced to perform labor and were subjected to gruesome medical experiments. *Id.* at ¶¶ 38-51. Thousands of prisoners died from inadequate food, unsanitary conditions and experiments, or were killed in the camp's crematorium, gas chamber, shooting pit, and gallows. *Id.*

A witness may offer expert opinion testimony if the witness' specialized knowledge will assist the trier of fact in understanding the evidence or issues. Fed. R. Evid. 702. Tuchel's affidavit regarding the origin and function of the Waffen SS, the SS Death's Head unit and the Sachsenhausen concentration camp assists the court by placing each in historical context. Wittje argues Tuchel's testimony is inadmissible because he lacks personal knowledge of the events at issue. Tuchel's testimony need not be based on personal knowledge if it is grounded on reliable available data. Fed. R. Evid. 703; *see also, United States v. Dailide,* 227 F.3d 385, 392 (6th Cir. 2000). Tuchel attests his knowledge is based on records prepared by German authorities between 1933-1945 in the course of their routine activities, postwar statements of witnesses, and works of other scholars. *Id.* at ¶ 8.

He attests these documents are regularly relied upon by historians and that he works extensively with these archived documents. *Id.* Tuchel cites multiple sources throughout his affidavit. *Id., passim.* Tuchel's testimony regarding the Sacshenhausen concentration camp and the SS Guard is grounded in data made available to him.

Wittje argues Tuchel's affidavit is meant to prejudice the court, because the details of the Sachsenhausen camp are irrelevant to the court's determination regarding the legality of his visa. The topics covered in Tuchel's affidavit are clearly relevant to the unique issues presented in this denaturalization case. The government alleges Wittje's service in the SS constituted membership in a movement hostile to the United States. By explaining the purpose of Sachsenhausen, the events that occurred there, and the role the SS played in guarding the camp, Tuchel's affidavit provides historical context to the Waffen SS and its status as a hostile movement.

Finally, Wittje's challenge to Tuchel's status as an expert lacks merit. Wittje makes much of the fact that Tuchel's undergraduate degree was in political science, not history. Tuchel's doctoral degree and professional experience evince scholarly focus on modern German history and specialized expertise regarding the Nazi party and concentration camp system. Further, Tuchel has served as an expert affiant and witness in other cases. The fact that a witness has been allowed to testify as an expert in other similar cases is some indication that he qualified to testify in this case. *See Backes v. Valspar Corp.*, 783 F.2d 77, 79 (7th Cir. 1986).

Tuchel is qualified to testify about the Sachsenhausen concentration camp system and the Waffen SS. However, the last two sections of his affidavit, section IV, ¶¶ 53-68, and section V, ¶¶ 69-74, recite factual information regarding Wittje from documents produced in discovery. For instance, Tuchel attests Wittje was born in Romania on July 29, 1920, as a member of the ethnic

7

German community. *Id.* at ¶ 53. He cites Wittje's deposition and a document which appears to be government exhibit 14 for this proposition. *Id.* at ¶ 53. He further attests Wittje was drafted into the Romanian army where he received cavalry training, was transferred to the eastern front and was admitted to the hospital when wounded by shrapnel. *Id.* at ¶ 54. Tuchel again cites Wittje's deposition testimony and government exhibit 14 for this information. The remaining paragraphs similarly depict a timeline of Wittje's life and service through a recitation of the facts found in documents and in Wittje's deposition. Although Tuchel has served as a historical document authenticator in the past, his mere recitation of the contents of documents does not authenticate them or provide foundation for admissibility. To the extent Tuchel purports to offer conclusions or opinions regarding Wittje, his testimony is disregarded.

## B. Affidavit of Chester Dunham

Chester Dunham attests that he served as United States Vice Consul in the United States Consulate in Salzburg, Austria from June 1949 through June 1950. Gov. Mem. Ex. 24, ¶ 5. Dunham was one of two vice consuls who worked exclusively on processing visa applications by ethnic Germans. *Id.* at ¶ 6. The other vice consul assigned to process ethnic German applications in Salzburg was Ralph McMahon. *Id.* at ¶ 7. Dunham and McMahon worked closely together, splitting the ethnic German applications in half alphabetically. *Id.* McMahon processed applications with names from the last half of the alphabet, and thereby processed Wittje's visa application. *Id.* at ¶¶ 7-8. McMahon's signature and stamp appear on Wittje's February 2, 1950 visa application. *Id.* at ¶ 8, Gov. Mem. Ex. 6. McMahon is apparently deceased.[3] Gov. Mem. at 3, n.4.

---

[3] Although the issue is uncontested, no evidence establishing McMahon's death has been submitted by the government.

8

Dunham describes the application process when Wittje sought his visa. Applicants first provided their information to a German-speaking employee of the consulate, who typed the applications. *Id.* at ¶ 11. Each applicant was then interviewed by either Dunham or McMahon. *Id.* at ¶ 12. Dunham conducted his interviews in German; McMahon also spoke German fluently. Dunham "is certain" McMahon conducted his interviews in German as well. *Id.* at ¶¶ 12-13. During interviews, the contents of the applications were discussed. At the end of the interviews, applicants were required to sign the applications and swear to the truth of their contents. *Id.* at ¶ 14. According to Dunham, applications were denied if an applicant was inadmissible to the United States; an ethnic German who served in the Waffen SS or the SS Totenkopf Sturmbann at a Nazi concentration camp was ineligible for a visa. *Id.* at ¶¶ 15-18. Dunham opines that McMahon, or any other vice consul, would have rejected Wittje's visa application upon learning of Wittje's service in the Waffen SS or the SS Totenkopf Sturmbann. *Id.* at ¶¶ 17-18.

Wittje's visa application reflected he was a "stateless" ethnic German from Romania. *Id.* at ¶ 10. Dunham attests that the only applicable basis for approval of Wittje's visa was the ethnic German provision of the displaced persons law. *Id.* at ¶¶ 9-10. He explains that ethnic Germans were not, at the time, eligible for visas under the standard displaced persons program. *Id.* Immigration visas were issued according to quotas assigned to various nationalities, and since "ethnic German" was not a country, there was no quota assigned to persons of ethnic German status. *Id.* at ¶ 10. However, a provision in the displaced persons law allowed part of the visa quotas for Germany and Austria to be reallocated to ethnic Germans from certain countries (including Romania), subject to certain exclusions. *Id.* at ¶¶ 9-10. Dunham does not specifically refer to the provision of law he describes as § 12 of the DPA. *Id.*

9

Wittje moves to strike Dunham's affidavit because: (1) Dunham is not an expert witness and offers no support for his assertion that an ethnic German in the Waffen SS would have been ineligible for a visa; and (2) Dunham lacks personal knowledge of Wittje's meeting with McMahon or the actions McMahon might have taken upon learning of Wittje's SS service. The government asserts that Dunham is an expert witness and that experts may provide evidence based upon specialized knowledge and experience. Fed. R. Evid. 702. The record reflects Dunham possesses specialized, relevant knowledge with respect to the processing of ethnic German visa applications during the period of Wittje's application. He was one of only two vice consuls in the Salzburg Consulate who processed ethnic German visas; his expertise pertains to the procedures by which visas were issued to ethnic Germans under the displaced persons law, and the effect SS membership had on those procedures. Dunham therefore satisfies Fed. R. Civ. P. 56(e)'s personal knowledge requirement. Vice consuls who did not process defendants' visa applications have been considered qualified experts regarding policies and procedures applicable to application processes. *See e.g., Federenko v. United States*, 449 U.S. 490, 511 (1981). However, Dunham's testimony regarding the actions McMahon took during applicant interviews, or would have taken had he learned of Wittje's SS service, constitute inadmissible speculation. *See* Gov. Mem. Ex. 24, ¶¶ 13, 17-19. The court strikes ¶¶ 13, 17-19 to the extent they speculate about procedures McMahon used in his applicant interviews and the actions McMahon would have taken with respect to Wittje.

### C. Government Exhibits 29-42

Wittje argues that government exhibits 29-42 are inadmissible. These exhibits include State Department documents and communications dating from 1943-1950, and: (1) an agreement between the German Reich and Romanian governments; (2) an excerpt from Annex I to the International

Refugee Organization Constitution; and (3) the Inimical List. The government contends these documents pertain to the scope and operation of the DPA and are admissible under various combinations of Fed. R. Evid. 803, 901 and 902. Wittje does not attack the admissibility of each exhibit individually, nor does he challenge the authenticity or relevance of the documents. Instead, he contends Fed. R. Civ. P. 56(c) does not permit the submission of miscellaneous papers unsupported by an affidavit. Not all documents submitted in support of a motion for summary judgment must be submitted in affidavit form. *Woods v. City of Chicago*, 234 F.3d 979, 987-88 (7th Cir. 2000). The court may consider any materials that would be admissible at trial, including properly authenticated documents. *Id.* Government exhibits 29-42 are certified as authentic and are therefore admissible. Fed. R. Civ. P. 44(a)(1)-(2); Fed. R. Evid. 902 (4).

## DISCUSSION

### I. Standard of Review

The government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." *Fedorenko v. United States*, 449 U.S. 490, 505 (1981), *quoting, Costello v. United States*, 365 U.S. 265, 269 (1961). The evidence justifying revocation must be clear, unequivocal, and convincing. *Id.* Summary judgment is appropriate in denaturalization proceedings when the moving papers and affidavits show there is no genuine issues of triable fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *United States v. Schmidt*, 923 F.2d 1253, 1257 (7th Cir. 1991). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable

11

inferences in the light most favorable to the non-movant. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## II. Denaturalization

Failure to strictly comply with the congressionally imposed requisites to citizenship renders a certificate of naturalization illegally procured and revocable. 8 U.S.C. § 1451(a); *Fedorenko* at 506. An individual's failure to lawfully enter the United States by means of a valid visa, a condition precedent to naturalization, mandates denaturalization. If the evidence demonstrates that citizenship was procured illegally, a court may not refuse to revoke citizenship. *Fedorenko*, 449 U.S. at 516; *United States v. Ciurinskas*, 148 F.3d 729, 732 (7th Cir. 1998).

### A. Section 12 of the DPA

The government alleges Wittje received his visa pursuant to Section 12 of the DPA (the "ethnic German" quota provision). Gov. Mem. at 5-7. To support its assertion, the government offers evidence that the Immigration Act of 1924 established annual immigration quotas for each nationality. *Id.*; Gov. Mem. Ex. 25. Because Wittje applied for and received a nonpreference quota immigrant visa based on his status as a Romanian-born ethnic German who was stateless at the time of his application, the government alleges § 12 was the only applicable basis for approval of his visa. Section 12 provided:

> 50 percentum of the German and Austrian quotas shall be available exclusively to persons of German ethnic origin who were born in Poland, Czechoslovakia, Hungary, Romania or Yugoslavia . . .

Gov. Mem. Ex. 26. At the time, ethnic Germans were not "of concern" to the International Refugee Organization. As a result, Congress worried that ethnic Germans would be disqualified from receiving "eligible displaced person" status under the proposed DPA if § 12 was not adopted. *Id.*;

Gov. Mem. Ex. 27; *Fedorenko*, 449 U.S. at 495, 496 nn.3-4, 510-11; *United States v. Kairys*, 600 F. Supp. 1254, 1265 (N.D. Ill. 1984), *aff'd* 782 F.2d 1374 (7th Cir. 1986). Section 12 altered the typical prohibition against quota transferring by permitting a portion of the annual German and Austrian quotas to be reassigned to ethnic Germans from specified countries, including Romania. Gov. Mem. Ex. 27. Section 12 was administered through the State Department's consular offices in Germany and Austria. Gov. Mem. Ex. 32. Because Wittje's visa application identified him as an ethnic German to the exclusion of any other nationality or citizenship, § 12 was the only available provision for processing his application. Dunham, one of the Salzburg vice consuls who processed ethnic German visa applications, confirms that Wittje's application could only have been issued under the ethnic German provision. Gov. Mem. Ex. 24 at ¶¶ 6-10.

Wittje admits he received a nonpreference quota visa as an ethnic German. Wittje Resp. Gov. Facts ¶ 34. However, without any supporting evidence, he denies that he received a visa under § 12 of the DPA. Wittje Facts ¶¶ 9-10. He argues he did not acquire a visa under the DPA because his visa documents and his certification of entry only mention the Immigration Act of 1924, and not the DPA specifically. Wittje Resp. at 3-4. He further argues that even Dunham's affidavit does not specifically mention he received a visa pursuant to § 12 of the DPA. *Id.* The Immigration Act of 1924 did not base visa quotas on ethnicity, rather it based quotas on nationality. *See* Immigration Act of 1924, Pub. L. No. 60-139, ch. 190, 43 Stat. 153, § 2(a). Wittje did not have a nationality when he applied for his visa; he was stateless. Therefore, his status as a "Romanian-born ethnic German" was the relevant characteristic on his application that permitted issuance of a visa under § 12 of the DPA. Wittje fails to cite any other immigration statute in effect at the time that made his ethnicity relevant. While Dunham does not explicitly attest to the section and title of the DPA by which

Wittje received his visa, his description of the law, particularly when compared to the legislative history of § 12, clearly illustrates that § 12 is the provision he describes. Gov. Mem. Ex. 27; *Fedorenko*, 449 U.S. at 495, 496 nn.3-4, 510-11; *United States v. Kairys*, 600 F. Supp. 1254, 1265 (N.D. Ill. 1984), *aff'd* 782 F.2d 1374 (7th Cir. 1986). In addition, Wittje argues there were no DPA visas available to ethnic Germans when he received his visa; this argument is unsupported by any record evidence. Wittje Resp. at 3, n.3. Indeed, the defendant in *United States v. Negele*, (who was represented by Wittje's counsel), received a visa pursuant to § 12 in February 1950, the same month as Wittje. *See* 222 F.3d 443, 446 (8th Cir. 2000). There is no genuine dispute that Wittje received his visa pursuant to § 12 of the DPA.

**B. Section 13 of the DPA**

Section 12 of the DPA was subject to the limitations imposed by § 13. Gov. Mem. Exs. 28 at 22, 35-36, 41. Section 13 provided:

> No visas shall be issued under the provisions of this Act to any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States.

Wittje admits that he served in the Waffen SS. Wittje Resp. at 5. Thus, the issue is whether under § 13 of the DPA, his service in the Waffen SS constituted membership in a movement hostile to the United States and rendered him ineligible to obtain a visa. The government has offered significant documentary and testimonial evidence that the Waffen SS was considered hostile to the United States and that membership precluded visa eligibility. *See e.g.*, Gov. Mem. Exs. 24, 31, 33-35, 39-40, 42. This court has previously concluded that service in the Waffen SS constitutes membership in a movement hostile to the United States. *See United States v. Hajda*, 963 F. Supp. 1452, 1461 (N.D. Ill. 1997) (service in SS battalion constituted membership or participation in a movement

14

hostile to the United States and rendered defendant ineligible to receive a visa under § 13 of the DPA), *aff'd* 135 F.3d 439, 447 (7th Cir. 1998); *see also United States v. Negele*, 222 F.3d 443 (8th Cir. 2000) (service in Waffen SS Death's Head guard unit constituted membership or participation in a movement hostile to United States).

Wittje does not address the foregoing legal authority. He merely submits a State Department telegram from April 1949 stating that § 13 refers to political rather than military organizations. Wittje Resp. Ex. G. As the government correctly points out, the Waffen SS, as a Nazi party organization, was considered a political organization and was not part of Germany's military forces. *See e.g.,* Gov. Exs. 35, 39-40. Wittje argues that the Inimical List (Gov. Mem. Ex. 31) of organizations considered hostile to the United States, including the Waffen SS, is undated and that its application to Wittje or the DPA is therefore speculative. Wittje Resp. at 6. Wittje admits, however, that his visa was issued in February 1950 during the 81st Congress and that the Inimical List was issued during the 80th Congress. Wittje Resp. at 6, n.7. Moreover, the Seventh Circuit has recognized that members of organizations on the Inimical List are ineligible for visas under the DPA. *United States v. Ciurinskas*, 976 F. Supp. 1167, 1182 (N.D. Ind. 1997), *aff'd* 148 F.3d 729 (7th Cir. 1998).

Wittje further argues the government must demonstrate he volunteered for the SS. The laws he cites in support of this argument were not in effect until 1951 and were not applicable to Wittje's 1950 application. The lawfulness of Wittje's entry must be determined by reviewing the law in effect at the time of his entry. *Fedorenko*, 449 U.S. at 507, 514. Further, the DPA does not impose a voluntariness requirement. An individual's service as a concentration camp guard, whether voluntary or involuntary, renders him ineligible for a visa under the DPA. *Fedorenko*, 449 U.S. at

15

512; *Ciurinskas*, 148 F.3d at 734 (voluntariness not an element of a § 13 DPA hostile movement charge); *see also*, Gov. Mem. Ex. 39.

Wittje contends that his role in the SS at Sachsenhausen did not involve service as an armed guard. Wittje Resp. at 5, n.5. His suggestion that his role was not hostile, or participatory in a hostile movement, is irrelevant to the motion for summary judgment on Count I. The hostile movement provision does not consider the role an individual played in the hostile movement. Rather, membership *per se* precludes visa eligibility. The "plain language of section 13 contains no requirement that a defendant personally participate in any hostile acts committed by the movement, and the legislative history suggests that Congress sought to exclude all members of such groups, regardless of the degree of their participation." *United States v. Koreh*, 59 F.3d 431, 444 (3d Cir. 1995) (editing newspaper that published anti-Semitic articles sufficient to establish participation in movement hostile to the United States); *see also Ciurinskas*, 148 F.3d at 734 (membership in Schutzmannschaft, ("protective force") sufficient to show participation in a movement hostile to United States, even if there was no active participation). There is no genuine factual issue that membership in the Waffen SS constituted membership in a movement hostile to the United States within the purview of § 13 of the DPA.

### C. Visa Ineligibility

Contrary to his assertions, the fact Wittje was permitted to enter the United States in April 1950 and was issued a certificate of arrival does not render his entry lawful. Wittje was ineligible to receive an immigration visa under the DPA and he therefore entered the United States with an invalid visa. By entering the United States with an invalid visa, he failed to gain lawful admission to the United States. *See United States v. Tittjung*, 235 F.3d 330, 336-37 (7th Cir. 2000). Because

lawful admittance to the United States for permanent residence is a requirement for naturalization under 8 U.S.C. § 1427(a)(1), Wittje procured his citizenship illegally. *Id.*; *see also, Negele,* 222 F.3d at 447.

## CONCLUSION

The material facts are undisputed. For the foregoing reasons, the government is entitled to judgment as a matter of law on Count I. Because summary judgment on Count I is sufficient to revoke Wittje's citizenship, Counts II-IV of the complaint are moot. Pursuant to 8 U.S.C. § 1451(a),(f), the United States citizenship of Joseph Wittje is revoked, the August 19, 1959 order of this court admitting Joseph Wittje to citizenship is set aside, Joseph Wittje's certificate of naturalization is cancelled and Wittje shall surrender his certificate of naturalization to the Attorney General.

August 27, 2004

ENTER:

Suzanne B. Conlon
United States District Judge